UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff and Counterclaim Defendant,<br><br>and<br><br>Beverly Boucher,<br><br>    Intervenor,<br><br>v.<br><br>Madison Property, L.L.C. and Andrew Brenner,<br><br>    Defendants and Counterclaim Plaintiffs. | File No. 22-CV-02831 (JMB/ECW)<br><br>**ORDER** |

Kristen Elise Rau and Liles Harvey Repp, United States Attorney's Office, Minneapolis, MN, for Plaintiff United States of America.

Jon R. Steckler, Madigan, Dahl & Harlan, P.A., Minneapolis, MN, for Defendant Madison Property, L.L.C and Andrew Brenner.

Jesse Swearingen Smith and Lisa R. Hollingsworth, Southern Minnesota Regional Legal Services, Inc., St. Paul, MN, for Intervenor Beverly Boucher.

      In this fair-housing action, Intervenor Beverly Boucher sought to rent an apartment from Defendants Madison Property, L.L.C. (Madison Property) and Andrew Brenner (together, Defendants). Defendants declined to rent to Boucher after she informed them that she wished to live in the apartment with an emotional support animal (ESA), a cat. In Count I, Plaintiff United States of America (Plaintiff) claims that Defendants refused to lease a unit to Boucher because of her disability, and in Count II, Plaintiff claims that

1

Defendants refused to grant Boucher's request for an accommodation to the apartment building's no-pets policy. The following three motions are before the Court: (1) Plaintiff's motion for summary judgment in its favor on Counts I and II; (2) Defendants' motion for summary judgment in its favor only as to Count I; and (3) Plaintiff's motion to exclude Defendants' expert witness, Stuart W. Steichen, M.D. (Doc. Nos. 87, 91, 97.) Boucher filed responses in support of Plaintiff's motion for partial summary judgment and in opposition to Defendants' motion for partial summary judgment. (Doc. Nos. 109, 111.)

For the reasons explained below, the Court denies both motions for summary judgment and grants Plaintiff's motion to exclude Defendants' expert witness.

## STATEMENT OF UNDISPUTED FACTS

### A. Madison Place Apartments

Madison Place (the Building) is an apartment building in downtown Winona, Minnesota. (Doc. No. 94 ¶ 1.) Madison Property owns the Building. (*Id.*) Brenner is the sole owner of Madison Property. (*Id.* ¶ 2.) Madison Place was built in 1932 as an elementary school and is on the National Register of Historic Places. (*E.g.*, Doc. No. 101-9 at 147:9–14; *See* Doc. No. 93-19.) Brenner converted the Building into twenty-one private apartment residences and began leasing them in spring 2021. (Doc. No. 94 ¶¶ 4, 6; Doc. No. 101-8 at 1.) While converting the Building to apartment units, Brenner sought to maintain its historic status. (Doc. No. 94 ¶ 4.) According to Brenner, because of the Building's historic status, "there are strict renovation and aesthetic restrictions on architectural or other changes to the Building." (*Id.* ¶ 3.)

2

Brenner testified that, at all relevant times, he has had primary responsibility for handling prospective tenant applications, giving tours, and performing maintenance work at the Building. (Doc. No. 101-9 at 17:4–9, 42:4–22; Doc. No. 101-7.)

The Building has a no-pets policy. (Doc. No. 101-16 at 4 ¶ 17.) According to Brenner, the Building has this policy for a few reasons. First, the Building still has its original interconnected ventilation system from 1932, "meaning pet dander and allergens from one unit can freely flow to another." (Doc. No. 94 ¶ 7; Doc. No. 101-9 at 199:2–3.) Brenner learned this in summer 2019—well before the events giving rise to this case occurred—when he commissioned a "Study of Ventilation Options" by a licensed engineer. (*See* Doc. No. 94-4.) Brenner estimates that the replacement and modernization of the ventilation system in the Building would exceed $300,000. (Doc. No. 94 ¶ 8.) To recoup such a cost, each unit in the Building would need to be leased for more than thirty-eight months. (*Id.* ¶ 9.) Second, Brenner, who spends a significant amount of time at the Building as its sole maintenance worker, experiences health impacts when he is exposed to pets, specifically cats, in two ways: (1) he is allergic to "[c]ertain cats" (Doc. No. 93-18 at 32:2–7), and (2) due to a congenital renal defect—for which he is on a waiting list for a kidney transplant—he has a decreased immune system, which can lead to respiratory infections that are "exacerbated by exposure to cats/pet dander." (Doc. No. 94 ¶ 5.) In, addition, Brenner knows that certain residents prefer buildings with no-pets policies. For example, one of the Building's first tenants, Bill Weber, has a pet allergy and told Brenner that he wanted to live in the Building because of the no-pets policy. (Doc. No. 93-18 at 153:5–14, 154:18–22; Doc. No. 96 ¶ 3.)

3

B.     Boucher's ESA

In or around 2006, Boucher adopted a cat, Stir Fry. (Doc. No. 93-3 at 6; Doc. No. 101-3 at 124:23–125:7.) In June 2019, Boucher received counseling from a therapist, Catherine Brightman (Doc. No. 163:2–22), who diagnosed Boucher with generalized anxiety.[1] (Doc. No. 93-3 at 6; Doc. No. 101-1 at 54:14–16, 60:20–21.) In February 2020, as part of her separation from her now ex-husband, Boucher moved out of her marital home and sought an apartment residence in West St. Paul. At that time, she had two or three cats, including Stir Fry. (*See, e.g.*, Doc. No. 93-7.) Boucher emailed Brightman, requesting a letter stating that Boucher's cat "Scarface" or "Missy" was Boucher's ESA[2]:

> Working on the lease for the new Apartment, I am under the impression that if the animals are support creatures, I can get the fees waived. They may need these forms filled out before I see you next. Is there a way for this to happen?

(*Id.*) Having received no immediate reply, she emailed again:

---

[1] Brightman later diagnosed Boucher with depression. (Doc. No. 114-21 at 60:20–61:24.)

[2] There are two types of animals for which individuals may seek accommodations to no-pet policies: (1) service animals, which are dogs that are individually trained to do work or perform tasks for a person with a disability, 28 C.F.R. §§ 35.104, 36.104; and (2) ESAs, which are untrained animals that provide certain assistance for individuals with disabilities. See U.S. Dep't of Hous. & Urban Dev., FHEO-2020-01, *Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act* (Jan. 28, 2020) [hereinafter, "HUD Guidance"] at 1 https://perma.cc/LK76-45LL. Whether service animals and ESAs have equal status under the FHA is an open legal question; however, HUD guidance and non-binding case law suggest equal status. *See, e.g.*, *Entine v. Lissner*, No. 2:17-CV-946, 2017 WL 5507619, at *9 n.7 (S.D. Ohio Nov. 17, 2017) (concluding that under the FHA "ESAs qualify as reasonable accommodations"); *Cohen v. Clark*, 945 N.W.2d 792, 800 (Iowa 2020) (stating that the FHA "recogniz[es] the validity of both" service animals and ESAs); *see also* HUD Guidance at 1.

> [S]o they need a letter explaining the cat being an emotional support animal and why she is an emotional support animal and the[y] want it ASAP. Of course.
>
> Can you do this? And email it to me? Not sure of your schedule. It would be Scarface. Or Missy. I appreciate you doing this it will save me 25. A month [sic] and a 400. Deposit. [sic]

(*Id.*) Brightman agreed to write a letter stating they played a supportive role in Boucher's life. (Doc. No. 114-8 ("I can write a letter supporting their emotionally supportive role in your life."); Doc. Nos. 114-9, 114-10 (providing Brightman with a link to "a website that gives the criteria" for ESAs), Doc. No. 101-5 (subsequently providing Boucher with a letter recommending that she live with an ESA).)

### C. Boucher Seeks to Rent a Unit at the Building

On March 14, 2021, Boucher submitted an online interest form for a unit at the Building. (Doc. No. 101-7 at 2.) On March 20, Brenner gave Boucher a tour of several units. (Doc. 93-14 at 1.) Brenner testified that he had not yet reviewed Boucher's financial qualifications before he gave the tour. (Doc. No. 94 ¶ 11.) Plaintiff and Defendants agree that, during the tour, Boucher disclosed to Brenner that she had a cat; however, they dispute whether Boucher disclosed that her cat was an ESA. (*Compare* Doc. No. 94 ¶ 10, *with* Doc. No. 101-3 at 172:24–173:8, 174:10–16.) According to Brenner, "Ms. Boucher mentioned having a cat," that he informed her that the Building was pet-free, and that she did not disclose that she had a disability or that the cat was an ESA. (Doc. No. 94 ¶ 10.)

5

According to Boucher, she told Brenner that she had an ESA cat. (Doc. No. 101-3 at 172:24–173:8, 174:10–16.)

During the tour, Boucher identified Unit #111 as the one she wished to rent. (Doc. No. 101-14 at 1.) Boucher gave Brenner a $500 check at the end of the tour. (Doc. No. 101-9 at 176:17–177:12; Doc. No. 101-19.) The monthly rent for the unit was $995 per month. (Doc. No. 101-16 ¶ 2.)

Thereafter, Brenner and Boucher exchanged emails regarding the unit. Boucher completed a rental application and in it disclosed that she earned $3,333.33 per month and that she had declared bankruptcy "20+ years ago." (Doc. No. 101-14.) On March 25, Brenner email Boucher the lease, stating "please read and make sure all is correct." (Doc. No. 94-9.) Also on March 25, Boucher emailed Brenner concerning the no-pets policy, explaining that she keeps an ESA and has "a letter from my Therapist regarding his existence in my life." (Doc. No. 94-8 at 1.)[3] Brenner replied that residents in the Building were not allowed to have pets and offered to refund her deposit. (Doc. No. 94-10 ("There are other places. Dont [sic] worry. I can refund your deposit.").) Boucher asked Brenner to refund her deposit, and Brenner agreed, wishing her luck finding an apartment. (*Id.*)

Brenner testified that he "never read [Brightman's letter]" regarding Boucher's ESA because he "think[s] [Boucher] was rejected before that" because she did not financially qualify to rent at the Building. (Doc. No. 101-1 at 188:21–25, 189:3–4, 192:13–16, 193:1–

---

[3] At some point on March 25, Boucher used a website she found via Google, which she used to "register" Stir Fry as an ESA. (Doc. No. 101-6; Doc. No. 101-3 at 160:18–161:11.)

6

3, 198:22; Doc. No. 94 ¶ 11.) Specifically, Brenner testified that he decided to reject Boucher's application because she "had no income," because "[s]he had zero money in her bank account," and because "[s]he declared bankruptcy." (Doc. No. 101-1 at 193:5–9.) When asked "what part did her having a cat play in your decision not to rent to her," Brenner testified that "[s]he was not accepted off of her finances period." (Doc. No. 101-1 at 203:10–12.) Brenner's testimony is unclear as to when he reviewed Boucher's financial qualifications.

Ultimately, Brenner rented Unit #111 to "a person who far exceeded the financial requirements for rental." (Doc. No. 94 ¶ 22.) That person did not have an ESA. (Doc. No. 101-1 at 83:12–16, 237:6–18.)

### D. This Action

On November 4, 2022, Plaintiff filed this action, asserting that Defendants violated the FHA in the following two ways: (1) Defendants engaged in disparate treatment discrimination by refusing to rent to Boucher on the basis of her disability in violation of 42 U.S.C. § 3604(f)(1) (Count I); and (2) Defendants refused to make an accommodation to its no-pets policy so that Boucher could live with her ESA, in violation of 42 U.S.C. § 3604(f)(3)(B) (Count II). (*See* Doc. No. 1 [hereinafter, "Compl."].) Before ultimately retaining counsel, Defendants asserted a pro se counterclaim against "plaintiffs for time, energy, mental anguish, adverse physical health harm, legal resource expenses and misc. to defend this suit" and because "[t]his case is frivolous." (Doc. No. 5.)

During the course of this litigation, Plaintiff retained an expert to provide an opinion "on ventilation and HVC and related issues relevant to" this case. (Doc. No. 101-8 at 1.)

Specifically, this expert opined that Unit #111 could have been "compartmentalized" to seal off the unit (*id.* at 3), "for well under $15,000." (*Id.* at 5–6).

Defendants also retained an expert, Dr. Stuart W. Steichen, D.O., to opine on Brenner's health condition. Dr. Steichen is Brenner's brother-in-law (Doc. No. 89-1 at 28:21–22) and a practicing osteopath. (*Id.* at 10:15–16, 11:1–5.) Dr. Steichen treated Brenner on two occasions: (1) in late 2021 or early 2022 at Dr. Steichen's home; and (2) in late 2022 or early 2023 by telephone. (*Id.* at 37:11–38:1, 75:4–8, 76:9–11.)

In the course of this litigation, Defendants produced a letter, on Dr. Steichen's clinic's letterhead, that reads as follows:

> Andrew Brenner . . . has been under my medical care for recurrent upper respiratory infections. He has a significantly decreased immune system which makes him very susceptible to upper respiratory infections. Andrew requires an environment that is very clean and free of any agents/irritants that would cause him to become ill. Exposure to cat dander is an allergen that he should avoid due to its likelihood to "trigger" an upper respiratory infection.

(Doc. No. 89-2 at 3.) Dr. Steichen testified that Brenner's "severe kidney disease" is what has caused his decreased immune system. (Doc. No. 89-1 at 94:11–97:1.) He admitted, however, that he had never spoken with Brenner about or reviewed Brenner's medical records relating to his kidney condition; instead, he had learned about Brenner's kidney health through his wife (i.e., Brenner's sister), who is not a physician. (*Id.*)

## DISCUSSION

Plaintiff seeks summary judgment on both counts. Defendants seek summary judgment on Count II. Plaintiff also moves to exclude Dr. Steichen's testimony. Because

8

questions of fact remain concerning an element of Plaintiff's prima facie case for its claims of disparate treatment and failure to accommodate, the Court denies the parties' motions for summary judgment. In addition, because Dr. Steichen's testimony would not assist the jury, the Court grants Plaintiff's motion to exclude.

I. **CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Of course, a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive the motion, the non-moving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). As is normally the case in a summary judgment motion, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. However, when faced with cross-motions, as here with Count 2, the Court "consider[s] each motion separately, drawing inferences against each movant in turn." *Jacobson v. Md. Cas. Co.*, 336 F.2d 72, 75 (8th Cir. 1964).

### A.     Count I: Disparate Treatment Discrimination

Plaintiff seeks summary judgment on its disparate treatment claim.[4] As discussed below, questions of fact remain concerning whether Plaintiff was financially qualified.

The FHA makes it illegal for a landlord to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a [disability]."[5] 42 U.S.C. § 3604(f)(1). To prevail on a disparate treatment claim, Plaintiff must prove that Boucher was subjected to disparate treatment *because of* her disability by Defendants either through direct evidence of discrimination[6] or, in the absence of direct

---

[4] As a threshold matter, Defendants argue that no disparate treatment claim is properly before the Court, and Plaintiff is, therefore, not entitled to relief under a disparate treatment theory. (Doc. No. 112 at 39.) This argument, however, misconstrues the Complaint, which makes unequivocal references to disparate treatment discrimination both in its text and in its citations to 42 U.S.C. § 3604(f)(1).

[5] The FHA uses the term "handicapped" when referring to disabled individuals. The use of the term "handicapped" is deemed outdated and its use is discouraged. *See, e.g.*, *Guidelines for Writing About People with Disabilities*, ADA Nat'l Network, at No. 6, https://adata.org/factsheet/ADANN-writing (last visited July 30, 2024); *Disability Language Style Guide*, Nat'l Ctr. On Disability & Journalism, https://ncdj.org/style-guide/ (last visited July 30, 2024) [https://perma.cc/7XR5-283N]. Therefore, the Court uses the term "disabled" instead.

[6] To show direct evidence of discrimination, a plaintiff must "show[] a specific link between the alleged discriminatory animus and the challenged [housing] decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse [housing] action." *Gallagher*, 619 F.3d at 831. Plaintiff argues that direct evidence of discriminatory animus exists here—specifically, Defendants had a blanket no-pets policy that did not explicitly make exceptions for ESAs and that Defendants relied solely on this policy to inform their decision to decline to rent to Boucher. (Doc. No. 98 at 13–14.) In support, Plaintiff relies on *United States v. Rupp*, No. 4:19-CV-02644-SEP, 2021 WL 2187912 (E.D. Mo. May 28, 2021). The Court is not convinced to apply *Rupp* in this case, however. *Rupp* involved a lease term that expressly prohibited all tenants with children, which was unlawful on its face because it applied to an entire protected class. *See* 42 U.S.C. § 3604(b) (listing protected classes under the FHA,

10

evidence, under the *McDonnell-Douglas* burden shifting framework. *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010). The "key element" of a disparate treatment claim is "discriminatory intent." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004).

Under the *McDonnell-Douglas* burden shifting framework the Plaintiff bears an initial burden to establish a prima facie case of discrimination, Defendants then bear the burden to articulate a legitimate nondiscriminatory reason for the housing decision, and Plaintiff bears the burden to establish that the legitimate nondiscriminatory reason is a pretext for "*the* actual, discriminatory, but-for cause of the [housing] decision." *Griffith v. City of Des Moines*, 387 F.3d 733, 740 (8th Cir. 2004) (Magnuson, J., concurring) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)) (emphasis in original). To make out a *prima facie* case of disparate treatment discrimination, Plaintiff must show the following four elements: (1) Boucher has a disability; (2) Defendants knew or should have known of Boucher's disability; (3) Boucher was qualified and wished to obtain housing with Defendants; (4) Defendants refused to rent to Boucher. *Radecki v. Joura*, 114 F.3d 115, 116 (8th Cir. 1997).

---

including "familial status"). By contrast, the lease term at issue here does not apply to a protected class, but only prohibits tenants from keeping "domestic dogs, cats, or birds" in the Building. (Doc. No. 94-1 ¶ 17.) Plaintiff makes no argument that people who own one of these animals are a protected class under the FHA, and although people with certain mental health diagnoses are members of a protected class, they do not always or necessarily own pets. Absent any evidence that ties the policy to a disability, Plaintiff has not identified any direct evidence of discrimination.

For purposes of deciding the pending motions, the Court assumes without deciding that Plaintiff can make a prima facie showing of the first two elements.[7] However, the Court concludes that the record before it contains genuine disputes of material fact concerning whether Boucher was financially qualified to obtain housing.[8] Here, the facts around Boucher's qualifications to rent are deeply disputed. Brenner is adamant that Boucher did not qualify to rent from him, and the Court considers the following evidence, which could support a finding that Brenner denied Boucher's rental application because of her unsatisfactory financial qualifications:

---

[7] Although in support of their summary judgment motion, Defendants state that they "do not contest that Boucher has alleged a disability" (Doc. No. 92 at 19), in the response to Plaintiff's motion, Defendants argue that Boucher was not disabled (Doc. No. 112 at 17–19). Under the FHA, a disability is "a physical or mental impairment which substantially limits one or more of such person's major life activities," 42 U.S.C. § 12102(1)(A); *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998), such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," 42 U.S.C. § 12102(2)(A); 24 C.F.R. § 100.201(a), (b). The record shows that, at the time Boucher applied to live in the Building, she had a diagnosis of generalized anxiety disorder. (Doc. No. 98 at 16.) Brightman testified that, as a result of that condition, Boucher had difficulties with self-care tasks (e.g., not leaving the house, brushing her teeth or showering for days) and interacting with others. (Doc. No. 101-1 at 57:12–58:25, 59:4–8.) Defendants direct the Court to record evidence to the contrary, and the Court concludes no reasonable trier of fact would find in Defendants' favor on the question of whether Boucher is a disabled person under the FHA.

[8] The evidence presented in support of and to dispute this third element of the prima facie case also relates to the third step of the *McDonnell-Douglas* burden shifting framework in this case because Defendants claim Boucher's lack of financial qualifications is a legitimate nondiscriminatory reason for denying her rental application. Given the Court's conclusion that material fact disputes remain concerning this prong of the prima facie case, the Court necessarily also concludes that these same disputes preclude a ruling in Plaintiff's favor concerning whether Boucher's purportedly deficient qualifications were a pretext for discrimination.

12

- Brenner testified that he did not want to rent to Boucher because "had no income," because "[s]he had zero money in her bank account," and because "[s]he declared bankruptcy." (Doc. No. 101-9 at 193:5–9.)

- In Brenner's estimation, Boucher was "the worst financial renter I've seen in this building" and "[s]he didn't qualify to live here." (*Id.* at 199:18–19, 24–25.)

- "[S]he turned in an application that was not accepted on her financials alone. Concrete legally she was not accepted. What comes after [i.e., asking to keep a cat] that it could be a double nonacceptance or triple nonacceptance." (*Id.* at 204:8–15.)

- "She was rejected. End of subject. Legally she can't live there because of her financials. Clear as day. Can't live there. So that was what I base my decision on." (*Id.* at 205:4–10.)

- Brenner testified that, without exception, "[n]obody comes in that building with a bankruptcy," and that someone with a bankruptcy filing on their record is "immediately disinvited in my building." (*Id.* at 129:17–22.) He testified that, because Boucher had a bankruptcy on her record, "She's done. She was done before I even talked to her. . . . She was done right away. . . . And she's also done but she had zero money in her bank account." (*Id.* at 138:7–14.)

- When asked whether Boucher's "bank account balance [was] the basis for declining to rent to her," Brenner testified: "Yes. That was one of the reasons." (*Id.* at 136:20–22.)

Plaintiff, for its part, points to evidence that it argues conflicts with Brenner's statements. For example, Plaintiff argues that Brenner rented units to individuals who had filed for bankruptcy. (*See* Doc. No. 102 at 2; Doc. No. 102-2; *see also* Doc. No. 98 at 10 (citing *In re Theron F. Hayse*, No. 5:03-BR-42214 (D. Kan. Bankr. Aug. 6, 2023).) While such evidence may suggest that Brenner overlooked another renter's poor financial history, the Court cannot conclude that this evidence is so overwhelming that it removes any genuine fact dispute regarding Boucher's qualifications because the record includes other evidence makes such a comparison less straight forward. For example, the record includes

13

evidence that a tenant who disclosed a prior bankruptcy also had $370,000 in assets unlike Boucher, who had approximately $3,000. (Doc. No. 124-20; *see also* Doc. No. 101-9 at 128:14–19 (testifying that an applicant's assets can overcome other financial concerns: "[i]f they have a whole bunch of money in their bank account, it's compensated for").) In sum, the conflicting evidence regarding Boucher's financial qualifications compels the Court to deny Plaintiff's motion for summary judgment on Count I.

### B. Count II: Failure to Accommodate

Both Plaintiff and Defendants seek summary judgment on Plaintiff's claim that Defendants failed to make an accommodation to the Building's no-pets policy in violation of the FHA. As discussed above, the evidence presented precludes granting the motions.

The FHA makes it unlawful for a landlord to "refus[e] to make reasonable accommodations in rules [or] policies," such as no-pet policies, "when such accommodations may be necessary to afford such [disabled] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Just as with Plaintiff's claim of disparate treatment discrimination, to prevail on a claim that a landlord refused to make a reasonable accommodation, Plaintiff must first make a prima facie showing of the following four elements (the first three of which are identical to the elements of the prima facie case that applies for a claim of disparate treatment discrimination): (1) Boucher is disabled under the FHA; (2) Defendants knew or should have known of Boucher's disability; (3) Boucher was qualified and willing to rent from Defendants; and (4) and that the requested accommodation, specifically, to waive the Building's no-pets policy to

14

accommodate Boucher's ESA cat, was reasonable and necessary[9] "to afford [her] equal opportunity to use and enjoy housing." *One Love Housing, LLC v. City of Anoka, Minn.*, 93 F.4th 424, 429 (8th Cir. 2024); *Whitfield v. Pub. Hous. Agency of City of St. Paul*, No. 03-CV-6096 (PAM/RLE), 2004 WL 1212082, at *2–3 (D. Minn. May 19, 2004).

As previously noted, the record contains genuine disputes of material fact regarding whether Boucher was qualified to rent an apartment at the Building. For that reason, neither party is entitled to summary judgment on Count II, and the Court need not address the remaining elements of the claim asserted in Count II.[10]

---

[9] The Court observes that Plaintiff's argument concerning whether the requested accommodation was necessary depends, at least in part, on a legal conclusion that landlords are obligated to engage in an interactive process under the FHA as employers are required to do under the Americans with Disabilities Act. *See Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999). The Court is not aware of any binding legal authority for imposing FHA liability based on a failure to engage in an interactive process. Plaintiff cites to no such authority, and other courts have declined to adopt this interpretation of the FHA. *See Huberty v. Wash. Cnty. Hous. & Redevelopment Auth.*, 374 F. Supp. 2d 768, 775 (D. Minn. 2005) (declining to interpret the FHA to include a requirement that the landlord engage in an interactive process and noting that "the Eighth Circuit has never imposed liability for failure to engage in the interactive process"); *see also* U.S. Dep't of Hous. and Urban Dev., *Guidance on Reasonable Accommodations and Modifications*, at 14–15 (Jan. 28, 2020) (stating that the landlord "is encouraged" to and "should" engage in interactive process, but that engagement in such process is not mandatory); *see also Edwards v. Gene Salter Props.*, 2017 WL 6045430, at *4 (E.D. Ark. Dec. 6, 2017), *rev'd on other grounds* 739 F. App'x 357 (Mem.) (8th Cir. 2018) (acknowledging that it is an "open question in th[e] [Eighth] Circuit" whether the ADA's requirement for employers to engage in interactive process applies in FHA reasonable-accommodation claims).

[10] Defendants also invoke the direct-threat defense, arguing that Boucher's requested accommodation was unreasonable because the presence of a cat in the building would cause a direct threat to other residents and Brenner. 42 U.S.C. § 3604(f)(9) (stating that landlords need not make housing "available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals"); *see also Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326–30 (6th Cir. 2023) (affirming grant of summary judgment to the defendant (a hospital) on grounds that no reasonable juror could find that

## II.     MOTION TO EXCLUDE DR. STEICHEN

Plaintiff also moves under Federal Rule of Civil Procedure 37(c) and Federal Rule of Evidence 702 to exclude testimony of Defendants' expert, Stuart W. Steichen, D.O. The Court agrees with Plaintiff that Dr. Steichen's testimony would not assist the jury.

Rule 702 of the Federal Rules of Evidence[11] provides that a witness may testify as an expert if they are "qualified" by their "knowledge, skill, experience, training, or education," so long as their opinion, among other things, "will help the trier of fact to understand the evidence or to determine a fact in issue" and is "based on sufficient facts or data." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Expert evidence will not be admitted if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). A purported expert's *ipse dixit* on subject matter, without support,

---

defendant failed to provide a reasonable accommodation because the animal in question (a pet dog) posed a direct threat to patients and staff); *Gamane v. Laman*, No. 1:22-CV-01199-JDB-jay, 2023 WL 4290063 (W.D. Tenn. June 30, 2023) (denying temporary injunction that would have permitted the plaintiff to keep an ESA cat in her unit because the defendant (an assisted living facility) was likely to succeed on the merits of its direct threat defense to the reasonableness of the requested accommodation). In this case, however, Defendant is not a hospital or assisted living facility, and a jury is best equipped to determine the reasonableness of incurring a $300,000 expense to overhaul the Building's aging ventilation system or the reasonableness of incurring the cost of implementation some other, less expensive mitigation measures. The evidence presented to the Court is not so one-sided that the Court can grant summary judgment to Defendants on the basis of its asserted direct threat defense.

[11] Plaintiff brings its motion under both Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 37(c). In light of the Court's decision to grant Plaintiff's motion pursuant to Rule 702, the Court need not address whether to also exclude the challenged testimony pursuant to Rule 37(c).

generally is not sufficient under Rule 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Dr. Steichen's opinions on Brenner's health condition are being offered to support Defendants' direct-threat defense—i.e., Defendants' assertion that their denial of Boucher's requested accommodation was reasonable because having a cat in the Building would negatively impact Brenner's health. Dr. Steichen testified that he did not treat Brenner for first time until "late 2021" at the earliest. (Doc. No. at 37:16–38:1.) Brenner made the decision to deny Boucher's accommodation request in March 2021—several months before ever treating with Dr. Steichen. (*See* Doc. No. 94-10.) In addition, Dr. Steichen's knowledge of Brenner's health condition that compromises his immune system is not something he learned of from treating Brenner. (Doc. No. 89-1 at 94:11–97:1.) Rather, Dr. Steichen testified that he had never spoken with Brenner about his kidney condition or ever reviewed Brenner's medical records relating to his kidney condition. (*Id.*) Indeed, all of Dr. Steichen's knowledge about this condition came from conversations with his wife (i.e., Brenner's sister), who is not a physician. (*Id.*) For these reasons, the Court therefore concludes that Dr. Steichen's opinion will not assist a trier of fact and should be excluded from the trial record.

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. Plaintiff United States of America's motion for partial summary judgment (Doc. No. 97) is DENIED.

2. Defendants Andrew Brenner's and Madison Property L.L.C.'s motion for partial summary judgment (Doc. No. 91) is DENIED.

3. Plaintiff's motion to exclude Defendants' expert, Stuart W. Steichen, D.O., (Doc. No. 87) is GRANTED.


Dated:  December 27, 2024                            /s/ *Jeffrey M. Bryan*
                                                                           Judge Jeffrey M. Bryan
                                                                           United States District Court